# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RENE PINKETT,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>DR. LEONARD'S HEALTHCARE CORP.,<br><br>　　　　Defendant. | Civil Action No. 18-1656 (JEB) |

## MEMORANDUM OPINION

After sustaining injuries from a B Yours Vibe 2 vibrator, Plaintiff Rene Pinkett sued both the product's seller and its manufacturer, asserting a number of tort claims. In a prior round of briefing, the manufacturer — Defendant Vee International, Inc. — successfully moved to dismiss on personal-jurisdiction grounds. See Pinkett v. Dr. Leonard's Healthcare Corp., 2019 WL 1992904, at *4 (D.D.C. May 6, 2019). By contrast, the seller — Defendant Dr. Leonard's Healthcare Corp. — sought dismissal for failure to state a claim. It was largely successful: of the four counts asserted against it, only the strict-liability one survived. See Pinkett v. Dr. Leonard's Healthcare Corp., 2018 WL 4682022, at *4 (D.D.C. Sept. 28, 2018). To support this claim, Plaintiff has advanced two distinct theories — manufacturing defect and design defect. Following discovery on the narrowed Complaint, Dr. Leonard's now moves for summary judgment. Finding that Pinkett has marshaled just enough evidence under the latter theory to keep her claim aloft, the Court will grant in part and deny in part Defendant's Motion.

## I. Background

Pinkett's allegations have been set forth in prior Opinions. See Pinkett, 2019 WL 1992904, at *1; Pinkett, 2018 WL 4682022, at *1. As the Court now looks at record evidence, it recites those facts in the light most favorable to her. See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

Vee International — an entity that does business as Blush Novelties — manufactures the Vibe 2. See Pinkett, 2018 WL 4682022, at *1. Retailers such as Dr. Leonard's then resell these products to individual consumers like Plaintiff. Id. In May or early June of 2015, Pinkett purchased the Vibe 2 from Dr. Leonard's mail-order catalogue, id., and used it on the day that it arrived. See ECF No. 34 (Pl. Opp.), Exh. 5 (Deposition of Rene Pinkett) at 16:7–11. Her session, however, did not go as planned. Within minutes of inserting the device, Plaintiff felt it "heat up" and injure the "inside of [her] vaginal wall." ECF No. 31 (Def. MSJ), Exh. B (Pinkett's Interrog. Resp.) at 2. At that moment, she removed the vibrator, burning her leg in the process. Compare id. (stating that she dropped it on the floor, but it "bounced up" and burned her leg), with Pinkett Depo. at 34:9–11 ("It finally came out, it hit the bottom of my leg down here, then hit the floor.").

In reaction to this episode, Plaintiff filed suit against Vee International and Dr. Leonard's. See ECF No. 1, Attach. 2 (Sup. Ct. Docs.), Exh. A (Complaint). She asserted a variety of tort claims, including strict liability, negligence, breach of implied warranty, and negligent supervision. Id., ¶¶ 25–120. In response, the two Defendants lodged separate motions to dismiss. Vee International, for its part, maintained that the Complaint fell short of establishing either specific or general jurisdiction. See Sup. Ct. Docs. at ECF pp. 68–70 (Vee First MTD). Following a round of jurisdictional discovery, the Court agreed and dismissed the Complaint

against the manufacturer for want of jurisdiction. See Pinkett v. Dr. Leonard's Healthcare Corp., 2018 WL 5464793, at *1 (D.D.C. Oct. 29, 2018); Pinkett, 2019 WL 1992904, at *4.

Dr. Leonard's took a different route. It contended that the Complaint failed to state a claim. See ECF No. 4 (Dr. Leonard's MTD). The Court largely agreed, finding that Plaintiff had pled enough only for one of her claims — a strict-liability count — to clear the dismissal hurdle. See Pinkett, 2018 WL 4682022, at *1. Discovery having concluded on that sole remaining count, Dr. Leonard's now moves for summary judgment.

## II.     Legal Standard

Upon a party's motion, Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it can affect the substantive outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record," such as affidavits, declarations, or other evidence. See Fed. R. Civ. P. 56(c)(1). If the non-movant's evidence is "merely colorable" or

"not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50.

## III. Analysis

To make out a strict-liability claim, Plaintiff must prove by a preponderance of the evidence that: "(1) the seller was engaged in the business of selling the product that caused harm; (2) the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one which the seller expected to and did reach the plaintiff consumer or user without any substantial change from the condition in which it was sold; and (4) the defect was a direct and proximate cause of the plaintiff's injuries." Warner Fruehauf Trailer Co. v. Boston, 654 A.2d 1272, 1274 (D.C. 1995) (citing Restatement (Second) of Torts § 402(A)). Here, Dr. Leonard's maintains that Pinkett has not met the second or fourth elements. See Def. MSJ at 15–28. For ease of discussion, the Court will address those positions in reverse order.

### A. Causation

On the fourth element of causation, Defendant mounts two principal attacks. As a threshold matter, it contends that Plaintiff has not offered enough evidence to prove that she was injured at all. See Def. MSJ at 25–27. Second, it argues that her evidence on direct and proximate cause is deficient. Id. at 23–25, 27–28. The Court considers both points.

#### 1. *Injuries*

To withstand summary judgment based on an asserted insufficiency of proof of damages — in this case, the proof of personal injury — a plaintiff is "obligated only to show that [her injuries] exist and are not entirely speculative." Cormier v. Dist. of Columbia Water & Sewer Auth., 959 A.2d 658, 667 (D.C. 2008) (cleaned up) (quoting Rafferty v. NYNEX Corp, 744 F. Supp. 324, 331 n.26 (D.D.C. 1990)). Pinkett has done so here.

As noted, she alleges vaginal injuries and a leg burn. Beginning with the former, Plaintiff says that as she first used her vibrator, it became "extra, extra hot" — so much so that she described the experience as the "the worst burning feeling I ever felt in my life." Pinkett Depo. at 29:15–17. Shortly after that, Plaintiff noticed that she was bleeding in and around her vaginal area. See, e.g., id. at 40:6–10 ("I was burned — I know the inside was really, really burning the most. And on the outside, it was like right around here where the blood was at and somewhere up in here."); id. at 40:11–15 (Q: You mentioned . . . that you felt a wet sensation, and you had to go to the bathroom after, is that correct? A: Yeah. It was blood."); see also id. at 46:2–13 (averring that she experienced internal burns and scarring).

A visit to her physician four days after the incident lends some support to her story. Pinkett complained about the above symptoms to her doctor, Asha Robinson-Parks. See Pl. Opp., Exh. 4 (Dr. Asha Robinson-Parks Report) at ECF p. 199. Her physician was unable to evaluate her condition at that time, however, and asked her to return. Id. ("Asked patient to return to the office for vaginal exam without the toddler. She agrees."); see also Pinkett Depo. at 42:14–16 ("And they wouldn't see me cause I had the grandbaby. They didn't see me that day anyway. Had to come back."). Plaintiff did so twelve days later. See Robinson-Parks Rep. at ECF p. 198. During that follow-up visit, she revealed that her "initial symptoms" of "pain, bleeding, and peeling skin" had all "resolved." Id. In her telling, only some "discomfort" remained from the vibrator incident. Id. A subsequent examination largely confirmed what Pinkett had suggested: besides a yeast infection, the doctor did not identify any other health concerns. Id. (finding "no damage" to "vaginal mucosa or cervix" and that external genitalia appeared "unremarkable"); see also Def. MSJ, Exh. D (July 8, 2015, Robinson-Parks Report) at

5

ECF p. 1.  Although Plaintiff's injuries appear to have been short lived, this does not mean that they did not exist at all.

Pinkett, moreover, avers that she burned one of her legs while removing the vibrator.  See Pinkett Depo. at 36:12–13.  Shortly afterward, she developed some redness and peeling at the burn sites.  Id. at 36:17–21.  As with her vaginal injuries, the harm that Plaintiff suffered to her leg did not last long; she says that her skin "returned to normal" within two weeks.  Id. at 37:11–13.

Although the extent and severity of her injuries appear minor, Pinkett has sufficiently proven their existence at this stage.  See Cormier, 959 A.2d at 667.  It may well be that her damages at trial will not be significant, but that will be within the province of the jury to decide.

   2. *Direct and Proximate Cause*

With that, the Court turns to Plaintiff's evidence on causation.  On this front, it is important to note that she has offered testimony from Jeffrey Kobilka — an electrical-engineering expert — concerning the Vibe 2's defective nature.  See Section III.B.2, *infra*.  Although the Court will spend more time on the expert's report later, it suffices to say for now that the vibrator may not have operated as intended; indeed, there is evidence that battery failure caused the product to overheat, thereby injuring Plaintiff.  See Pl. Opp., Exh. 1 (Jeffrey Kobilka Expert Report) at 19; id., Exh. 3 (Deposition of Jeffrey Kobilka) at 25:6–13 ("[T]he battery became hot, hot enough to burn away the wrapping of the battery, hot enough to cause localized melting within the battery compartment.  So the temperatures that were presented to the user through the battery compartment were sufficient to cause burn injury.").

According to Plaintiff's expert, the alleged defect was a cause in fact — *i.e.*, direct cause — of her injuries.  See Kobilka Rep. at 19; see also McNeal v. Hi-Lo Powered

6

Scaffolding, Inc., 836 F.2d 637, 644 (D.C. Cir. 1988) (explaining that liability attaches when there is "substantial and direct causal link" between plaintiff's injury and tortious conduct) (quoting Dist. of Columbia v. Freeman, 477 A.2d 713, 716 (D.C. 1984)). It is also a proximate cause in the sense that it is reasonably foreseeable that a battery failure in an electronic device could cause that device to overheat and produce bodily injury. See Kobilka Rep. at 19; see also McNeal, 836 F.2d at 644 (noting that proximate cause encompasses "foreseeability of injury") (quoting Freeman, 477 A.2d at 716).

Not so fast, Defendant retorts — there are holes in Pinkett's evidence of direct causation. See Def. MSJ at 23–25. Dr. Leonard's calls attention to Kobilka's report, where he concluded that the defect was limited to the vibrator's battery component. See Kobilka Rep. at 19, ¶¶ 3–4. This fact is significant, Defendant argues, because it is directly at odds with the location of Plaintiff's injuries. See Def. MSJ at 24–25. More specifically, it contends that Pinkett did not burn her hand when she used the Vibe 2, even though that part of her body came into direct contact with the allegedly defective battery component. See Pinkett Depo. at 36:3. Seeking to cast additional doubt on the cause of Plaintiff's vaginal injuries, moreover, Dr. Leonard's notes that Pinkett testified that she did not insert this component into her body. Id. at 31:6–32:5.

Defendant's argument has some superficial allure. A closer look at the record, however, reveals that there is more to this story. For one thing, Plaintiff said that she did not sustain any hand injuries because she let go of the vibrator when it "started burning," even though it remained lodged inside of her. Id. at 37:1–3. Further, contrary to Dr. Leonard's submission, there is some evidence that the battery component made contact with Plaintiff's vagina. When the vibrator became "extra hot," Pinkett explains that she began "jumping up and down, screaming, trying to shake it out." Id. at 29:19–20; see also id. at 37:3–4 ("I'm trying to jump up

7

and own and get it out of me . . . ."). Drawing all reasonable inferences in her favor, see Liberty Lobby, 477 U.S. at 255, the battery component could have come into contact with her vaginal area at this time, thus causing burns.

As for proximate cause, Dr. Leonard's contends that Kobilka "lacks a sufficient factual basis for his opinion that battery failure is reasonably foreseeable." Def. MSJ at 27–28. As evidence of this, it points out that he stated that he was unaware of any statistics regarding the frequency of such failure in devices. Id. at 27; see Kobilka Depo. at 114:16–18 ("I don't have statistics on incidences of battery-powered devices causing thermal events.").

This argument is unpersuasive because Dr. Leonard's conflates foreseeability with mathematical probability. When examining proximate cause, "courts have uniformly applied what might be termed a practical, common-sense test, the test of common experience." Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 620 (10th Cir. 1998) (quoting 57A Am. Jur. 2d Negligence § 489). In the Court's view, a jury is capable of finding, in light of all the evidence, that the battery compartment in an electrical device like the Vibe 2 could foreseeably overheat and cause injury to someone. See, e.g., Sikkelee v. Precision Airmotive Corp., 907 F.3d 701, 715–16 (3d Cir. 2018) (explaining that whether design defect proximately caused injury is question of fact ordinarily resolved by jury); Ferraro v. Hewlett-Packard Co., 721 F.3d 842, 848 (7th Cir. 2013) (same).

Defendant's challenge on causation thus comes up short. The Court, accordingly, proceeds to the second element — i.e., defect— of her strict-liability claim.

B. Defect

Generally, the law recognizes three actionable categories of defect: manufacturing defect, design defect, and insufficient warning. Warner, 654 A.2d at 1274. Here, Pinkett alleged the first two, see Compl., ¶ 82, which the Court will consider in turn.

1. *Manufacturing Defect*

A product that is typically safe "contains a manufacturing defect when [it] departs from its intended design." Restatement (Third) of Torts: Prod. Liab., § 2 (1998). To establish a claim under this theory, a plaintiff must show that "a specific product unit was defective as a result of 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction.'" Bertini v. Smith & Nephew, Inc., 8 F. Supp. 3d 246, 257 (E.D.N.Y. 2014) (quoting Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001)).

On this score, Pinkett does not meet her burden. She points only to a few statements in the report of her expert, who maintains that the vibrator should have been designed with additional thermal resistance. See, e.g., Pl. Opp. (Statement of Material Facts in Dispute), ¶ 18; Kobilka Rep. at 19, ¶ 2 ("Blush Novelties failed to manufacture a safe product by not protecting the user from the heat of a failed battery . . . ."). These statements, however, are relevant to the design-defect inquiry; nowhere has Plaintiff identified how her Vibe 2 deviated from its intended design — as is required to prove a manufacturing defect. See Dan B. Dobbs *et al.*, Dobbs' Law of Torts § 452 (2d ed.). In fact, her own expert admitted that he was unfamiliar with "the particular manufacturing process for this device." Kobilka Depo. at 50:15–16. Given this deficiency, Dr. Leonard's is clearly entitled to summary judgment on the first of Pinkett's theories.

2. *Design Defect*

A product has a design defect, conversely, where "there [is] a feasible way to design a safer product and an ordinary consumer would conclude that the manufacturer ought to have used that alternative design." Hull v. Eaton Corp., 825 F.2d 448, 454 (D.C. Cir. 1987). To prove such a defect here, Pinkett relies again on testimony from Kobilka.

The Court pauses briefly to set out his testimony in broad strokes. In a September 2018 report, he determined that "[b]attery failure and subsequent heat generation are foreseeable failure modes of a battery powered vibrator." Kobilka Rep. at 19, ¶ 1. To find out just how much heat the vibrator generated, Kobilka induced a battery failure on an exemplar Vibe 2 device. Id. at 6. He then measured the temperature over time of both the external battery compartment and the body of the product. Id. According to his findings, the battery compartment reached a dangerous surface temperature after roughly 110 seconds. See Kobilka Rep. at 17 (describing temperatures up to 52 degrees Celsius as "safe"); id. at 9 (data reflecting that battery component passed that temperature at 110 seconds). These results, in his telling, revealed that the manufacturer should have produced a safer product that had "adequate thermal resistance between the battery compartment and the operator." Id. at 19. Dr. Leonard, for its part, believes that Kobilka's findings are inaccurate and thus contests the admissibility of his report altogether. See Def. MSJ at 15–23.

In addressing Defendant's argument, this Court notes that it has "'broad discretion in determining whether to admit or exclude expert testimony.'" United States *ex rel.* Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871, 895 (D.C. Cir. 2010) (quoting United States v. Gatling, 96 F.3d 1511, 1523 (D.C. Cir. 1996)). Under Federal Rule of Evidence 702, which governs the admissibility of such testimony, trial courts are required to act as gatekeepers who may only

admit expert testimony if it is both relevant and reliable.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 597 (1993); Calvetti v. Antcliff, 346 F. Supp. 2d 92, 110–11 (D.D.C. 2004) (describing district court's "gatekeeping function").  Dr. Leonard's challenges each of these criteria.

          a.    Relevance

To start, expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); see also Daubert, 509 U.S. at 591 ("This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (internal quotation marks omitted).

Here, Dr. Leonard's maintains that Kobilka's findings are not helpful in supporting Plaintiff's allegations.  See Def. MSJ at 20–23.  More specifically, it points to Pinkett's earlier pleadings, wherein she made clear that she used the Vibe 2 for approximately 60 to 90 seconds before it injured her.  See Compl., ¶ 10; Pinkett's Interrog. Resp. at 2.  Kobilka's own data, Dr. Leonard's contends, shows that the exterior battery compartment would not have heated up enough during that period to cause injury.  See Kobilka Rep. at 9 (maximum surface temperature below 52 degree Celsius at 90 seconds).

At her deposition, however, Plaintiff testified that she used the product for about three minutes.  See Pinkett Depo. at 35:2–3.  At trial, Defendant is free to draw out any inconsistencies in her testimony, but at this juncture, the Court must view the evidence in the light most favorable to her.  See Talavera, 638 F.3d at 308.  In so doing, it notes that, at three minutes, Kobilka's data shows that the vibrator's battery compartment would certainly have reached a dangerous temperature.  See Kobilka Rep. at 10 (56.5 degrees Celsius).

As a fallback, Defendant argues that, even if Plaintiff used the vibrator for that long, it would have heated up incrementally, not "dramatically," as Pinkett had suggested. See Def. MSJ at 22. Hence, the argument goes, she should have had enough time to react and remove it without sustaining injury. Id. Even assuming that the vibrator did heat up gradually, that only gets Defendant so far. Pinkett testified that she struggled to remove the device after she experienced discomfort, see Pinkett Depo. at 33:6–7; id. at 37:3–4, which explains why she could have been burned before dislodging it. As a result, none of Defendant's arguments carries the day.

        b. Reliability

The trial judge, moreover, has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); see also Daubert, 509 U.S. at 588 (noting "the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to 'opinion' testimony" in the context of expert testimony) (internal quotation marks omitted). Although the way in which "reliability is evaluated may vary from case to case," United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (*en banc*), in all cases, "[t]he trial judge . . . must find that [the proffered expert testimony] is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory comm. notes (2000 amend.).

On this issue, Dr. Leonard's maintains that Kobilka's testimony is unreliable for two principal reasons. First, it focuses on the batteries that Pinkett used in her Vibe 2 device on the day of the incident. See Def. MSJ at 16–18. It points out that Plaintiff averred that she had used two Duracell batteries. See Pinkett Depo. at 20:2–3 ("Q: You had used both of the same batteries? A: Same."); id. at 20:8–9 ("Q: Do you think they were both Duracell? A: They were.

12

Both batteries were the same."). Kobilka, conversely, examined the actual device and discovered batteries from different manufacturers. See Kobilka Depo. at 18:15–19:2 ("[M]y observation was that there was one Activ Energy battery and one Duracell battery."). Under the impression that Pinkett had mixed the batteries, Kobilka used one of each in all his tests. Given the ambiguity concerning the source of batteries, Defendant argues that Kobilka's findings are fatally deficient.

The Court disagrees. Kobilka was retained to assess whether the Vibe 2 has a design defect. He determined that it did. To be sure, he admitted that his testing would have been "somewhat different" had he believed that Pinkett used two Duracell batteries, in that he would have also used two batteries of this type to simulate Plaintiff's experience more closely. See Kobilka Depo. at 20:4–5. In any event, he predicted that the results would have been the same. Id. at 20:5–7 ("I don't anticipate that would have changed the outcome."). At trial, Dr. Leonard's, of course, can attempt to cast doubt on that conclusion.

Defendant's final argument is that Kobilka's findings are unreliable for another reason: he did not include every test he conducted in his report. See Def. MSJ at 18–19. There is no rule so requiring, and the fact that Kobilka did not do so here goes to the weight of his report, not its admissibility. At trial, Dr. Leonard's is free to inquire whether, and to what extent, Kobilka's additional tests undercut his findings. At this stage, given the "liberal thrust" of the Federal Rules, the Court finds that Kobilka's testimony is admissible.

## IV.  Conclusion

For these reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ James E. Boasberg
                                                                JAMES E. BOASBERG
                                                                United States District Judge
Date:  March 31, 2020